UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

MIKHAIL GURMAN; ESTER
KRUGLYAK; VALERIY BABUSHKIN;
SVETLANA BABUSHKINA; SVETLANA
BARSKIY; RADA SHEVTSOV, f/k/a Rada
Babushkina; and VICRO HOME CARE,
INC., a Minnesota Corporation,

Case No. 11-CV-0228 (PJS/JJG)

Plaintiffs,

v.

METRO HOUSING AND
REDEVELOPMENT AUTHORITY;
METROPOLITAN COUNCIL; CARVER
COUNTY COMMUNITY DEVELOPMENT
AGENCY; TAMARA M. PETERS, f/k/a
Tamara M. Witt, officially and individually;
THERESE A. SMITH, officially and
individually; BETH A. REETZ, officially and
individually; KATHLEEN M. SHEA,
officially and individually; ALLISON
STREICH, officially and individually; and
DEFENDANTS X, Y, AND Z,

ORDER TO SHOW CAUSE

Defendants.

---

Richard A. Saliterman, Brian P. Lundgren, and Brett M. Larson, SALITERMAN &
SIEFFERMAN, PC, for plaintiffs.

Andrew D. Parker, Anthony G. Edwards, and Tammy L. Pust, PARKER ROSEN LLC,
for defendants Metro Housing and Redevelopment Authority, Metropolitan Council,
Tamara Peters, Therese Smith, Beth Reetz, and Kathleen Shea.

Jessica A. Megorden and James R. Andreen, ERSTAD & RIEMER, PA, for defendants
Carver County Community Development Agency and Allison Streich.

This order compels the attorneys for plaintiffs in this case — the law firm of Saliterman

& Siefferman, PC ("S&S"), and attorneys Richard A. Saliterman, Brian P. Lundgren, and Brett

M. Larson — to show cause why they should not be sanctioned under Rule 11 of the Federal

Rules of Civil Procedure or 28 U.S.C. § 1927 for filing an amended complaint that contained

numerous frivolous claims after being specifically and emphatically warned by this Court not to

do so.

This is a relatively straightforward case, and, in the hands of most attorneys, this would

be prosecuted quickly and efficiently.  Plaintiffs Mikhail Gurman and Ester Kruglyak ("the

Gurmans") and plaintiffs Valeriy Babushkin and Svetlana Babushkina ("the Babushkins") are

two elderly couples who live in Minnesota.  Plaintiff Svetlana Barskiy is the daughter of the

Gurmans; plaintiff Rada Shevtsov is the daughter of the Babushkins.  And plaintiff Vicro Home

Care, Inc. is a corporation owned by Barskiy and Shevtsov; it provides health-care and other

services to clients in their homes.  Some of Vicro's clients are on government assistance, and

thus the government often pays for the services that Vicro provides.

Both the Gurmans and the Babushkins are poor, and both are apparently clients of Vicro,

and thus the government appears to be paying Barskiy and Shevtsov to care for their own parents.

Both the Gurmans and the Babushkins also receive Section 8 housing subsidies from the federal

government.  Those subsidies are paid to the Gurmans' and Babushkins' landlords — who are

none other than their daughters, Barskiy and Shevtsov.  Thus, Barskiy and Shevtsov charge their

parents rent to live in condominiums that they own, and the government subsidizes those rent

payments.  That is not all.  Because the Gurmans and the Babushkins are married, each couple

would normally be eligible to live in a subsidized one-bedroom apartment.  But their daughters'

company (Vicro) helped them to find a doctor to certify that they needed to live in two-bedroom

apartments for medical reasons — and that, in turn, resulted in higher Section 8 subsidies being paid to the daughters.

Defendants are government agencies and employees who are responsible for administering the Section 8 housing program in the Twin Cities area. Sometime in 2009, defendants decided that the Gurmans and the Babushkins really did not need to live in two-bedroom apartments, and defendants reduced the Gurmans' and the Babushkins' benefits from two-bedroom vouchers to one-bedroom vouchers. It appears, however, that defendants did not provide the process to which the Gurmans and Babushkins were entitled under federal regulations and perhaps the United States Constitution.

In January 2010, defendants concluded that the Gurmans and Babushkins had not used the second bedroom as a bedroom when they were receiving two-bedroom vouchers, suggesting that the Gurmans and Babushkins had not been truthful when they claimed that a second bedroom was medically necessary. Defendants moved to cut off all Section 8 benefits to the Gurmans and Babushkins and to force them to repay the benefits that they had received in the past. But defendants bungled the job. In letters sent to the Gurmans and Babushkins in January 2010, one of the defendants accused them of submitting "false documentation of disability" and of failing to accurately report "household composition and/or income." At least the latter statement was clearly false; neither the Gurmans nor the Babushkins have ever lied about their household composition or income. It also appears that defendants had not put together a very strong case against the Gurmans or Babushkins, as defendants withdrew their allegations and abandoned their attempts to cut off the couples' Section 8 benefits in July 2010.

In November 2010, however, defendants stopped paying Section 8 subsidies to Shevtsov because defendants received information that Shevtsov no longer owned the condominium that she had been renting to her parents (the Babushkins). Shevtsov disputes that she lost ownership of the condominium at that time, although she apparently concedes that she did lose ownership of the condominium sometime later. At some point, though, the Babushkins moved to a different condominium owned by their daughter. Defendants insist that the Babushkins remain eligible for Section 8 benefits, and that subsidies will once again be paid to Shevtsov as soon as she signs the appropriate paperwork.

Basically, then, there appear to be three viable sets of claims in this case. First, the Gurmans and the Babushkins appear to have a colorable claim that they were deprived of due process when their two-bedroom vouchers were replaced with one-bedroom vouchers. They may be entitled to an order requiring that their two-bedroom vouchers be restored and ordering defendants to pay their reasonable attorney's fees. Second, all of the plaintiffs seem to have a colorable claim that they were defamed, although given that the allegedly defamatory communications were sent only to the alleged victims of the defamation (the Gurmans and Babushkins) and copied only to people within the agencies, it appears that defendants have viable defenses to these claims and that, if the claims survive, plaintiffs will have difficulty recovering substantial damages at trial. Finally, the Babushkins or Shevtsov may have some sort of claim arising out of defendants' decision to suspend payments to Shevtsov, although it is hard to know what that claim would be, and the claim does not appear to be worth more than a few thousand dollars — especially because, if what defendants say is true, most of the damages are due to Shevtsov's refusal to sign paperwork regarding the new condominium.

That's it — a relatively straightforward Section 8 case, similar to hundreds of Section 8 disputes that are settled by federal and state courts and administrative-law judges every year. Yet in pursuit of these relatively straightforward claims, S&S filed this lawsuit on behalf of 7 plaintiffs against 10 defendants, including Metro Housing and Redevelopment Authority ("Metro HRA"); Metropolitan Council ("Met Council"); Carver County Community Development Agency ("CCCDA"); Metro HRA's outside counsel, Mary Dobbins, and her law firm, Landrum and Dobbins, LLC; and five public employees (both officially and individually): Kathleen Shea, Tamara Peters, Beth Reetz, Therese Smith, and Allison Streich. Plaintiffs' first amended complaint contained 17 counts. First Am. Compl. [Docket No. 9]. Nine counts were brought on behalf of all plaintiffs against all defendants;[1] two counts were brought on behalf of all plaintiffs save Vicro against all defendants;[2] four counts were brought on behalf of the Gurmans and the Babushkins against all defendants;[3] one count for abuse of process was brought on behalf of Barskiy and Shevtsov against all defendants; and finally one count for breach of contract was brought on behalf of the Gurmans and the Babushkins against Met Council and CCCDA. In total, plaintiffs' first amended complaint contained *938* separate claims.[4]

---

[1]Malicious prosecution; intentional infliction of emotional distress; defamation; conversion; trespass; invasion of privacy; Federal Fair Housing Act ("FFHA"); 42 U.S.C. § 1983; and Section 504 of the Rehabilitation Act ("Rehabilitation Act").

[2]Tortious inference with contract and the Minnesota Human Rights Act ("MHRA").

[3]Due process; publication of private facts; 42 U.S.C. § 1981; and Title II of the Americans with Disabilities Act ("ADA").

[4]This conservative estimate does not take into account the fact that some of the federal anti-discrimination statutes provide for multiple causes of action. For example, S&S brought claims under the ADA for direct discrimination and failure to provide reasonable accommodations.

In an order dated June 30, 2011, the Court admonished S&S for filing this abusive

kitchen-sink complaint in violation of Rules 8 and 11 of the Federal Rules of Civil Procedure.

June 30, 2011 Order [Docket No. 37].  As to Rule 8, the 62-page, 249-paragraph complaint —

with 175 pages of exhibits attached — was neither "short" (because it was long) nor "plain"

(because it was largely incomprehensible).  *See id.* at 1-2.  The Court also made clear that, in its

opinion, S&S had almost surely violated Rule 11.  *See id.* at 2 ("It is inconceivable that all 17 of

these claims satisfy Rule 11(b)(2) as asserted by *every* plaintiff against *every* defendant, and

some of these claims almost certainly do not satisfy Rule 11(b)(2) as asserted by *any* plaintiff

against *any* defendant.") (emphasis in original).

The Court could have moved at that point to sanction S&S for failing to comply with

Rule 11.  The Court also could have simply dismissed the entire complaint for failure to comply

with Rule 8.  Instead, the Court gave S&S and plaintiffs a second chance to file a complaint that

complied with the rules.  The Court explicitly warned S&S and plaintiffs, however, that if they

chose to file another complaint, they must do the following:

First, the complaint "must make clear which specific plaintiffs and which specific

defendants are the subject of which specific allegations.  Blanket references to 'plaintiffs' or

'defendants' are unacceptable unless the references genuinely apply to every plaintiff and every

defendant."  June 30, 2011 Order at 5.

Second, the factual allegations in the complaint must "have evidentiary support," as

required by Fed. R. Civ. P. 11(b)(3), and must not mislead by omission.  *Id.*

And third, the legal claims asserted in the complaint must be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2); *see also* June 30, 2011 Order at 2, 6.

To provide additional guidance, the Court specifically highlighted plaintiffs' defamation claims, which were brought on behalf of all plaintiffs against all defendants. June 30, 2011 Order at 6-7. The Court observed that, "almost certainly, not *every* defendant uttered *every one* of the allegedly defamatory statements described in paragraphs 162 and 163 of the complaint, as the complaint alleges." *Id.* (emphasis in original). The Court also reminded S&S that, under Minnesota law, defamation claims must "clearly identify who said what to whom and when" to be properly pleaded. *Id.* at 7 n.4.

S&S filed a second amended complaint on July 29, 2011, dropping Dobbins and her law firm from the lawsuit. Second Am. Compl. [Docket No. 38]. S&S also dropped 4 state-law counts, leaving 13 counts against the remaining 8 defendants. Despite the clear warning from the Court, 12 out of 13 counts were filed against each and every defendant, and most of the 13 counts were brought on behalf of each and every plaintiff. In total, plaintiffs' second amended complaint contained *634* separate claims.

In filing the second amended complaint, S&S appears to have violated Rule 11, 28 U.S.C. § 1927, and this Court's order of June 30, 2011, as the second amended complaint contains a host of claims that are plainly — and, in some cases, *concededly* — without legal or factual basis. To cite several examples:

*First*, S&S asserted malicious-prosecution claims on behalf of Barskiy, Shevtsov, and Vicro. *See* Second Am. Compl. at ¶ 102 ("Defendants, without probable cause and with malice,

did cause and continue to pursue the prosecution and unlawful allegations against Plaintiffs after

it became evident that Defendants could not succeed on the merits.").  But, as plaintiffs have

conceded, no prosecutions of any kind were ever brought against Barskiy, Shevtsov, and Vicro.

*See* Pl. Opp. Mem. to Metro HRA's Mot. to Dismiss ("Pl. Opp. Mem.") at 35 [Docket No. 59]

("Defendants are correct that though they were included in the allegations, no administrative,

civil, or criminal action was taken against Plaintiffs Barskiy, Shevtsov, or Vicro.").  Obviously,

someone who has not been *prosecuted* cannot bring a claim for *malicious prosecution*.

     *Second*, S&S asserted abuse-of-process claims on behalf of Barskiy, Shevtsov, and Vicro.

*See* Second Am. Compl. at ¶ 115 ("Defendants' true intent and purpose for its [sic] malicious use

and abuse of the Minnesota legal process was to damage Plaintiffs by unlawfully inflicting

mental, physical, emotional, and financial injury upon *all* Plaintiffs.") (emphasis added).  Yet

Barskiy, Shevtsov, and Vicro were never subject to any legal process.  *See* Pl. Opp. Mem. at 35.

Someone who has never been *subjected* to any process obviously cannot bring a claim for *abuse*

of process.

     *Third*, S&S asserted a claim for intentional infliction of emotional distress on behalf of

Vicro.  *See* Second Am. Compl. at ¶ 120 ("Plaintiffs have suffered severe emotional distress as a

result of Defendants' wrong actions.").  Common sense would suggest that corporations do not

have emotions, and thus cannot sue for intentional infliction of emotional distress.  Even a

modicum of legal research would have confirmed that the law reflects this common sense.[5]

---

     [5]*See Wilson v. Colonial Penn Life Ins. Co.,* 454 F. Supp. 1208, 1213 n.9 (D. Minn. 1978)
("Certainly, the plaintiff National City Bank of Minneapolis is incapable of suffering emotional
distress."); *see also Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 n.2 (1st Cir.
2000) ("Because corporations, unlike natural persons, have no emotions, they cannot press

*Fourth*, S&S asserted a claim for conversion on behalf of Vicro. *See* Second Am. Compl.

at ¶ 128 ("Defendants, and each of them in their official and individual capacities, wrongfully,

maliciously, and unlawfully intentionally exercised and attempted to exercise dominion and

control over Plaintiffs' personal property . . .").  But as Lundgren conceded at the hearing, Vicro

has no property interest in the Gurmans' or the Babushkins' Section 8 benefits, and therefore

cannot bring a claim for conversion.

     *Fifth*, the defamation claims that S&S brought on behalf of all plaintiffs against all

defendants contain patently false factual allegations.  With respect to the claims brought on

behalf of Vicro, Barskiy, and Shevtsov, the second amended complaint alleges the following:

> Defendants, and *each of them*, in their official and individual
> capacities knowing the same to be false or with reckless regard
> [sic] to its truth or falsity, intentionally, maliciously and *willfully*
> *published to others* the following *specific comments*, or used words
> to express or imply *exactly the following*, regarding Plaintiff Vicro
> and its owners, Plaintiffs Barskiy and Shevtsov, by, among other
> conduct:
>
>     (a) Stating that Vicro is a "made up company";
>
>     (b) that Vicro and its owners were comparable to
> "Al Capone" or organized crime participants; and

---

claims for intentional infliction of emotional distress."); *F.D.I.C. v. Hulsey*, 22 F.3d 1472,
1489 (10th Cir. 1994) ("Since a corporation lacks the cognizant ability to experience emotions, a
corporation cannot suffer emotional distress."); *Lampliter Dinner Theater, Inc. v. Liberty Mut.
Ins. Co.*, 792 F.2d 1036, 1040 n.2 (11th Cir. 1986) ("We agree with the district court that
corporations cannot experience emotional distress and cannot therefore maintain a suit for
outrageous conduct."); *Earth Scientists (Petro Services) Ltd. v. U.S. Fidelity & Guar. Co.,* 619 F.
Supp. 1465, 1474 (D. Kan. 1985) ("A corporation cannot suffer severe emotional distress.");
*Barreca v. Nickolas,* 683 N.W.2d 111, 124 (Iowa 2004) ("The Factory, as a limited liability
company, certainly cannot suffer emotional distress; such would stretch the bounds of the legal
fiction of corporate personhood too far.").

>        (c) that Vicro and its owners were dishonest or
>        criminal.

Second Am. Compl. at ¶ 123 (emphasis added).  The allegation that *each* defendant published

*each* of the enumerated statements is indisputably false and is, in fact, contradicted by the very

exhibits that were attached to the complaint in support of the allegation.  The statement that

Vicro is a "made up company" was made by Streich in an email to Peters on January 16, 2009.

*See* Second Am. Compl. Ex. B.  The reference to Al Capone was made by Shea in an email to

Peters on January 27, 2009.  *See* Second Am. Compl. Ex. C.[6]  And although the termination-of-

assistance letters that were sent to the Gurmans and the Babushkins may have implied that Vicro

and its owners engaged in unlawful activity, those letters were signed only by Streich.  *See*

Second Am. Compl. Ex. F.  Defendants Shea, Peters, and Reetz were *recipients* of copies of

those letters; there is no reason to believe that they "willfully published" them.

The defamation claims that S&S brought on behalf of the Gurmans and the Babushkins

contain similar patently untrue allegations.  The second amended complaint alleges that:

>        Defendants, and *each of them*, in their official and individual
>        capacities knowing the same to be false or with reckless regard
>        [sic] to its truth or falsity, intentionally, maliciously and willfully
>        *published to others* the following *specific comments*, or used words
>        to express or imply *exactly the following*, regarding the Babushkin
>        and Gurman Plaintiffs:
>
>        (i) that they are untruthful and dishonest people;
>
>        (ii) that they had lied about their financial status in
>        violation of the law;

---

[6]Moreover, Shea never actually said that Vicro and its owners were comparable to Al
Capone.  Rather, her statement was simply that "the IRS got Capone, they can get anybody." *See*
Second Am. Compl. Ex. C.

(iii) that they had lied about their familial status in violation of the law;

(iv) that they had lied about their medical conditions in violation of the law; and

(v) that they had lied about their use of their second bedrooms in violation of the law.

Second Am. Compl. at ¶ 124 (emphasis added).  Again, the termination-of-assistance letters

signed by Streich may have implied that the Gurmans and the Babushkins had violated the law.

But there is nothing to suggest that *each* of the employee defendants who are being sued for

defamation uttered *each* of the allegedly defamatory statements.  This violation of Rule 11 is

particularly inexcusable, given that this Court had specifically instructed S&S on how to properly

plead defamation claims.  *See* June 30, 2011 Order at 6-7.

     *Sixth*, S&S asserted discrimination claims under Title II of the ADA against the employee

defendants in their personal capacities.  *See* Second Am. Compl. at ¶ 183 ("Defendants, and each

of them in their individual and official capacities . . . unlawfully discriminated against the

Gurman Plaintiffs' [sic] and the Babushkin Plaintiffs by denying benefits of the Section 8

program by reason of disability.").  The law is clear, however, that discrimination claims under

Title II of the ADA can only be asserted against public entities, not individual employees of

public entities.  S&S admitted in its briefing that these claims should only have been brought

against the public-entity defendants.  *See* Pl. Opp. Mem. at 23 ("[I]t is true that the individual

Defendants cannot be held individually liable for an ADA claim under current Eighth Circuit

precedent."); *see also Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010)

("Individuals in their personal capacities . . . are not subject to suit under Title II, which provides

redress only from public entities.") (citing *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8

(8th Cir. 1999) (en banc)); *Garcia v. SUNY Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107

(2d Cir. 2001) (same).

 *Seventh*, S&S asserted discrimination claims under Section 504 of the Rehabilitation Act

against the employee defendants in their personal capacities.  *See* Second Am. Compl. at ¶ 177

("Defendants, and each of them in their individual and official capacities, . . . unlawfully

discriminated against the Babushkin and Gurman Plaintiffs by excluding them from participation

in and denying them benefits provided and overseen by Defendant agencies who receive Federal

financial assistance.").  Again, S&S acknowledged that the discrimination claims under the

Rehabilitation Act should not have been brought against individual defendants.  *See* Pl. Opp.

Mem. at 24; *see also A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir. 2007) ("Suits may

be brought pursuant to Section 504 against recipients of federal financial assistance, but not

against individuals.") (en banc); *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) ("The rights,

procedures, and enforcement remedies under Title II [of the ADA] are the same as under section

504.").

 *Eighth,* S&S misleadingly implied that the Gurmans lost all of their Section 8 benefits in

2010.  *See* Second Am. Compl. at ¶ 30 ("The Gurman Plaintiffs began receiving [Section 8

benefits] and continued to receive benefits every year thereafter until 2010."); *see also* Second

Am. Compl. at page 39 ("Plaintiffs hereby respectfully requests [sic] of this Court for the

following relief: . . . for damages caused by any eviction and subsequent homelessness resulting

from the termination of the Babushkin and Gurman Plaintiffs' Section 8 benefits.").  At the

hearing, however, the Court asked Lundgren if, in fact, the Gurmans had ever lost all of their

Section 8 benefits.  Even though Lundgren signed the second amended complaint that seemed to

make exactly that allegation, Lundgren deferred to Larson to answer the question.  Larson then

told the Court that the Gurmans had, in fact, had all of their Section 8 benefits cut off for a

lengthy period of time.  The Court asked Larson if he was sure, as the Court had noticed his

clients gesticulating and loudly grumbling (as they did throughout the hearing, typically in

response to something one of their lawyers said).  Larson said that he was sure.  Later in the

hearing, however — after Larson had spoken to his clients during a break — Larson informed the

Court that, in fact, the Gurmans had not had their Section 8 benefits terminated, but had merely

had their two-bedroom voucher reduced to a one-bedroom voucher.

And this brings up another problem with S&S's work:  Almost a year after commencing

this lawsuit — and after filing a complaint, a first amended complaint, and a second amended

complaint — Lundgren and Larson stood before the Court on December 8, 2011 and were unable

to answer even the most basic questions about the allegations that they have made in this

complaint.  Time and again, the attorneys said that they did not know or flipped helplessly

through the second amended complaint looking for the answer (which, of course, was not in the

second amended complaint, or the Court would not have asked the question).  The Court formed

the distinct impression that the second amended complaint was largely drafted by — and that this

litigation is largely being controlled by — not S&S, but their clients, and particularly Barskiy and

Shevtsov.  If the Court's impression is correct, then Saliterman, Lundgren, and Larson have

abdicated their roles as attorneys and officers of this Court.

By highlighting some of the specific deficiencies in the second amended complaint, the

Court by no means implies that this is the full extent of the sanctionable conduct committed by

S&S and perhaps its clients.  Indeed, the Court will be surprised if discovery does not reveal other, perhaps even more egregious, Rule 11 violations.  For example, the Court very much doubts that there will be evidentiary support for the allegation in the second amended complaint that *each and every defendant* "unlawfully enter[ed] the Plaintiffs' property, photograph[ed] and stalk[ed] them."  Second Am. Compl. at ¶ 108(c).  In fact, the Court anticipates that it will learn that most or all of the individual defendants have never set foot on the property of any of the plaintiffs, have never taken a photograph of any of the plaintiffs, and have never "stalked" any of the plaintiffs.  If the Court's suspicions are confirmed — and S&S and its clients have accused the individual defendants of criminal acts without any basis whatsoever — then the Court will impose additional sanctions.  Likewise, should discovery uncover other Rule 11 violations, the Court will not hesitate to impose appropriate sanctions.

The Court does not enter this show-cause order lightly.  (Indeed, this is only the second order that the undersigned has ever issued under Rule 11(c)(3).)  The Court went out of its way to avoid sanctioning S&S when it issued its June 30 order, pointing out the problems with the first amended complaint and giving S&S explicit warnings and instructions about the filing of a second amended complaint.  Just about any lawyer would have responded to the Court's order by going through the first amended complaint line-by-line and re-pleading only those claims that would pass muster under Rule 11.  But S&S chose to defy the Court's warnings and instructions and to re-plead numerous patently frivolous claims.  S&S must now show cause why it should not be sanctioned for its conduct under Rule 11 and 28 U.S.C. § 1927.

ORDER

Based on the foregoing, on Fed. R. Civ. P. 11(c)(3) and 28 U.S.C. § 1927, and on all of

the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      The law firm of Saliterman & Siefferman, PC, and attorneys Richard A.

        Saliterman, Brian P. Lundgren, and Brett M. Larson, must show cause why

        sanctions should not be imposed on them jointly — or on each of them

        individually — for violating Rule 11(b) and for unreasonably and vexatiously

        multiplying the proceedings in this case in connection with each of the following

        claims or allegations:

        a.      Malicious-prosecution claims on behalf of Barskiy, Shevtsov, and Vicro;

        b.      Abuse-of-process claims on behalf of Barskiy, Shevtsov, and Vicro;

        c.      A claim for intentional infliction of emotional distress on behalf of Vicro;

        d.      A claim for conversion on behalf of Vicro;

        e.      Defamation claims on behalf of all plaintiffs against all defendants;

        f.      Discrimination claims under Title II of the Americans with Disabilities

                Act against the individual defendants in their personal capacities;

        g.      Discrimination claims under Section 504 of the Rehabilitation Act against

                the individual defendants in their personal capacities; and

        h.      Allegations that the Gurmans lost all of their Section 8 benefits.

2.      Saliterman & Siefferman, Saliterman, Lundgren, and Larson must respond to this

        show-cause order no later than February 1, 2012.  In their response, they must

        explain why they should not be sanctioned for pursuing each of the above-

-15-

described claims or allegations — or, if they agree that sanctions are warranted,

they must explain what sanctions would be sufficient under Fed. R. Civ. P.

11(c)(4) and 28 U.S.C. § 1927.

Dated: January 13 , 2012                          s/Patrick J. Schiltz
                                                  Patrick J. Schiltz
                                                  United States District Judge