UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MIKHAIL GURMAN; ESTER KRUGLYAK; VALERIY BABUSHKIN; SVETLANA BABUSHKINA; SVETLANA BARSKIY; RADA SHEVTSOV, f/k/a Rada Babushkina; and VICRO HOME CARE, INC., a Minnesota Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>METRO HOUSING AND REDEVELOPMENT AUTHORITY; METROPOLITAN COUNCIL; CARVER COUNTY COMMUNITY DEVELOPMENT AGENCY; LANDRUM AND DOBBINS, LLC; MARY G. DOBBINS, officially and individually; TAMARA M. PETERS, f/k/a/ Tamara M. Witt, officially and individually, THERESE A. SMITH, officially and individually; BETH A. REETZ, officially and individually; KATHLEEN M. SHEA, officially and individually; ALLISON STREICH, officially and individually; and DEFENDANTS X, Y, AND Z,<br><br>Defendants. | Case No. 11-CV-0228 (PJS/JJG)<br><br>ORDER |

William Skolnick and Sean Shiff, SKOLNICK AND SHIFF, P.A., for movant.

Svetlana Barskiy, pro se.

This lawsuit was settled and, as part of the settlement, a sum of money was paid by certain of the defendants to certain of the plaintiffs. Some of those settlement funds are being held in the trust account of Skolnick & Shiff, P.A. ("S&S"). S&S now moves to establish an attorney's lien on those funds for legal work that one of its partners, William Skolnick, did on

behalf of plaintiffs. Plaintiffs oppose the motion.[1] The parties are familiar with the facts, so they will not be recounted here.

## I. LEGAL FRAMEWORK GOVERNING ATTORNEY'S LIENS

An attorney's lien is an equitable security interest created to prevent a client from benefitting from an attorney's services without paying for those services. *Kaler Doeling Law Office v. Rector*, No. A11-847, 2011 WL 6757466, at *2 (Minn. Ct. App. Dec. 27, 2011). Should the client recover money as a result of an attorney's services, the attorney's lien enables the attorney to recover fees owed by the client. *Id.*

Attorney's liens were invented by the common law but, in Minnesota, attorney's liens have long been governed by a statute — Minn. Stat. § 481.13. Under the statute, an attorney has a lien for compensation from a client "whether the agreement for compensation is expressed or implied. . . ." § 481.13, subd. 1(a). In the context of litigation, "[a]n attorney has a lien for compensation . . . upon the interest of the attorney's client in any money or property involved in or affected by any action or proceeding in which the attorney may have been employed . . . ."

---

[1] Plaintiffs are no longer represented by counsel in this matter. Barskiy is not an attorney, and thus she can represent only herself, and not any of the other individual plaintiffs. *See Jones ex rel. Jones v. Corr. Med. Services, Inc.*, 401 F.3d 950, 952 (8th Cir. 2005) ("[A] non-attorney . . . may not engage in the practice of law on behalf of others."). Barskiy also cannot represent plaintiff Vicro Home Care, Inc. ("Vicro"), as a corporation must be represented by a licensed attorney in federal court. *See Carr Enterprises, Inc. v. United States*, 698 F.2d 952, 953 (8th Cir. 1983) (per curiam) ("It is settled law that a corporation may be represented only by licensed counsel.").

Because the Court did not explain this to Barskiy or the other plaintiffs, however, the Court will deem all of the individual plaintiffs to have appeared pro se, opposed S&S's motion, and adopted Barskiy's arguments as their own. (The Court will treat S&S's motion as unopposed by Vicro.) But if there are further proceedings, each individual plaintiff will have to file his or her own papers, appear personally before the Court, and argue on his or her own behalf. The Court will not permit Barskiy to represent anyone but herself.

§ 481.13, subd. 1(a)(2). The lien "may be established, and the amount of the lien may be determined, summarily by the court" upon application of the attorney claiming such a lien. § 481, subd. 1(c).[2]

Section 481.13 is unclear about whether a court may both establish and enforce an attorney's lien in a single hearing, or if two separate hearings — one to establish the lien, the other to enforce the lien — must be conducted. Two panels of the Minnesota Court of Appeals have said that the answer is dictated by the "plain language" of the statute; unfortunately, though, those two panels could not agree about the meaning of that statutory text. In *Thomas A. Foster & Associates, LTD v. Paulson*, 699 N.W.2d 1, 6 (Minn. Ct. App. 2005), the Minnesota Court of Appeals found that, under "the plain language of the statute," courts may establish and enforce an attorney's lien in the same proceeding. But three years later, in *Dorsey & Whitney LLP v. Grossman*, 749 N.W.2d 409 (Minn. Ct. App. 2008), the Minnesota Court of Appeals found that the "plain language" of the same statute authorizes courts "only to summarily

---

[2] Because this Court has original jurisdiction over the underlying action under 28 U.S.C. § 1331, and because S&S's claim for attorney's fees is so related to the claims in the underlying action that "they form part of the same case or controversy under Article III of the United States Constitution," this Court has supplemental jurisdiction over S&S's claim under 28 U.S.C. § 1367(a). *See Moreno Farms, Inc. v. Tomato Thyme Corp.*, No. 12-10294, 2012 WL 4074109, at *1 (11th Cir. Sept. 17, 2012) ("The existence of an attorney's lien against a party's recovery in a lawsuit is part of the same case or controversy as the underlying lawsuit."); *Zack v. City of Minneapolis*, 601 F. Supp. 117, 119 n.1 (D. Minn. 1985) (finding ancillary jurisdiction to hear a motion to enforce an attorney's lien). If, however, this Court's original jurisdiction over the underlying action were based solely on 28 U.S.C. § 1332, it is doubtful that this Court would have jurisdiction over S&S's claim, as the claim is made under state law, as S&S and all of the plaintiffs appear to be citizens of Minnesota, and as the amount in controversy between S&S and plaintiffs does not exceed $75,000. *See* 28 U.S.C. § 1367(b); *Griffin v. Lee*, 621 F.3d 380 (5th Cir. 2010) (finding no supplemental jurisdiction over an attempt by an attorney to establish a lien on his client's recovery in a diversity case).

establish the lien" — not also to enforce the lien — in the initial hearing. *Grossman*, 749 N.W.2d at 422.

Fortunately, the Court need not determine which interpretation of § 481.13 is likely to be adopted by the Minnesota Supreme Court. As noted, the funds on which S&S seeks to establish a lien are currently being held in S&S's trust account. Minnesota law is clear that, when a law firm seeks to establish a lien on funds being held in its own trust account, "there is no need to initiate a separate lien foreclosure proceeding," *Rector*, 2011 WL 6757466 at *4, because there is nothing for the law firm to foreclose upon. Thus, the Court determines that, under the circumstances of this case, the Court may both establish and enforce an attorney's lien in a single hearing because the claimed property is money sitting in the trust account of S&S.[3]

## II. SKOLNICK'S REPRESENTATION OF PLAINTIFFS

The Court cannot establish the attorney's lien sought by S&S unless it first determines that an attorney-client relationship existed between S&S and plaintiffs. S&S contends that, at all relevant times, Skolnick was acting as plaintiffs' attorney. Plaintiffs disagree, arguing that Skolnick was retained by Saliterman & Siefferman, P.C. ("Saliterman"), plaintiffs' attorneys in the underlying action, to protect those attorneys from future attorney-malpractice claims by plaintiffs. According to plaintiffs, they were never in an attorney-client relationship with Skolnick.

---

[3] Plaintiffs argue that § 481.13 requires the filing of notice of an attorney's lien with the Minnesota Secretary of State before the lien may be enforced. Plaintiffs are incorrect. As an initial matter, it is not clear to the Court that S&S could have filed notice of its lien before that lien had actually been established by a court. Putting that aside, even if S&S could have filed notice of its inchoate lien, filing notice of a lien is necessary only to enforce the lien "against third parties," not to enforce the lien against the "attorney's client." § 481.13, subd. 1(a).

-4-

Plaintiffs did not sign a formal retention agreement with S&S. Under Minnesota law, however, a contract establishing an attorney-client relationship may be either implicit or explicit. *Gramling v. Memorial Blood Centers of Minnesota*, 601 N.W.2d 457, 459 (Minn. Ct. App. 1999). Thus, the failure of S&S and plaintiffs to sign a formal written agreement does not preclude the Court from finding that a contract for legal representation existed between them.

On December 12, 2011, after months of dysfunctional and contentious litigation, the Court ordered plaintiffs and defendants to schedule a settlement conference with Magistrate Judge Jeanne J. Graham. ECF No. 70. The Court also ordered each side to bring to that conference an attorney who had not been involved in the case, so that each side would benefit from the perspective of an attorney who was not emotionally invested in the case. ECF No. 70. In compliance with that order, Saliterman contacted Skolnick about accompanying plaintiffs to the settlement conference. In late December 2011, Saliterman recommended Skolnick to Barskiy, who was informed that Skolnick would require a $3,000 retainer for his "involvement in the mediation." Shevtsov Aff. Ex. 1 at 4, May 30, 2012 [ECF No. 106] ("Shevtsov Aff.").

A settlement conference before Judge Graham was scheduled for January 13, 2012. At some point before that conference, plaintiffs paid $3,000 to S&S for Skonick's services, which strongly suggests that plaintiffs understood that Skolnick would be acting on their behalf. After all, plaintiffs would not be expected to pay the fees of an attorney who was going to be acting on behalf of someone else.

Once retained, Skolnick acted in a manner fully consistent with his claim to have been representing plaintiffs. After the parties were unable to settle during the January 13, 2012 conference, Judge Graham ordered the parties to return for a second settlement conference on

January 23, 2012. During the course of that second conference, Skolnick introduced himself as an attorney "on behalf of the plaintiffs." Settlement Conf. Tr. at 3, Jan. 23, 2012 [ECF No. 110]. As far as the record reflects, none of the plaintiffs disputed his characterization. When Judge Graham later asked which of plaintiffs' attorneys should be contacted about future developments, Skolnick responded "you can call me," and Judge Graham confirmed that future correspondence would go through Skolnick. *Id*. at 22. Again, plaintiffs said nothing.

Email messages sent after the January 23 conference further confirm that an attorney-client relationship existed between plaintiffs and Skolnick. These email messages demonstrate that Skolnick had regular contact both with opposing counsel and with Barskiy during the months following the settlement hearing. *See generally* Shevtsov Aff. Exs. 6-8. In one message, Barskiy thanked Skolnick for his "hard work and patience . . . during the settlement." Memo. in Opp. Ex. 8, Aug. 22, 2012 [ECF No. 115]. In messages between opposing counsel and Skolnick, opposing counsel referred to plaintiffs as "your clients" — that is, as Skolnick's clients — and Skolnick referred to plaintiffs as "my clients." Shevtsov Aff. Ex. 8. Barskiy was copied on those messages and did not raise any objection to the characterization of her and her fellow plaintiffs as Skolnick's clients, even though Barskiy is very bright, has monitored this litigation very closely, and has not been shy about speaking up when she disagreed with something said by one of the attorneys.

As noted, plaintiffs now argue that Skolnick's involvement in the case was limited to protecting Saliterman from future attorney-malpractice claims, and that Skolnick did not establish an attorney-client relationship with plaintiffs. For the most part, though, plaintiffs' argument reflects a misunderstanding of the common practices of the legal profession. For

example, plaintiffs make much of the fact that S&S addressed the first invoice for Skolnick's services to Saliterman, not plaintiffs. Skolnick Aff. Ex. 1. April 26, 2012 [ECF No. 104] ("Skolnick Aff."). But when a law firm is representing a party in litigation, and that law firm decides to hire an outside attorney to perform a discrete task on behalf of the party, it is common for the outside attorney to bill the firm and the firm to pass on the expense to the client. Moreover, in this case, S&S opened its file shortly after Saliterman contacted Skolnick about representing plaintiffs. At that time, S&S did not have an address for plaintiffs. It was reasonable for S&S to open the file using Saliterman's address, and reasonable for S&S to expect that it could bill Saliterman, and that Saliterman would pass the cost on to plaintiffs. None of this suggests that S&S was representing Saliterman rather than plaintiffs.

Moreover, although S&S sent its first invoice to Saliterman, it later sent that invoice and all other invoices directly to plaintiffs. And all of the services billed on those invoices — for example, attending settlement conferences, negotiating with defense counsel, corresponding with the parties, and reviewing draft settlement agreements and other documents — were clearly performed on behalf of plaintiffs, not Saliterman.

Plaintiffs also argue that because Saliterman never filed a motion to withdraw — and S&S never filed a formal appearance — Saliterman (not S&S) was the only firm representing plaintiffs in the matter. But it is not at all surprising — and not at all inconsistent with S&S's contention that it represented plaintiffs — that S&S never substituted for Saliterman as counsel. Skolnick was initially retained to perform one discrete function — accompanying plaintiffs and Saliterman to a settlement conference — not to take over as lead counsel in the litigation. At the time of Skolnick's retention, the settlement conference was expected to take only one day. If the

-7-

conference was successful, the case would be dismissed. If it was unsuccessful, the litigation would continue, and Saliterman would continue in its role as lead counsel (or, given the bad blood that had arisen between plaintiffs and Saliterman, plaintiffs would represent themselves pro se or find an attorney who was willing to take over from Saliterman). There was simply no reason for Saliterman to withdraw from the case prior to the conclusion of settlement negotiations, and no reason for S&S to enter a formal appearance.

Based on the entire record, the Court finds that an attorney-client relationship existed between plaintiffs and S&S. Nothing in the record supports plaintiffs' contention — made for the first time when S&S filed its motion to establish an attorney's lien[4] — that Skolnick was representing Saliterman rather than plaintiffs. To the contrary, the evidence strongly supports S&S's contention that it had an attorney-client relationship with plaintiffs and that all of the services that it performed in this matter were performed on behalf of plaintiffs.

### III. DETERMINING THE REASONABLE FEES OF S&S

Having found that an attorney-client relationship existed between S&S and plaintiffs, the Court must next determine how much S&S should be compensated for the legal services that it provided on behalf of plaintiffs. "The value of the lien ordinarily is determined based on the

---

[4] Plaintiffs allege that Barskiy disputed that Skolnick was their attorney in a comment that she made about a draft of the settlement agreement. Her comment, however, does not state that Skolnick was *never* plaintiffs' counsel, only that "Mr. Skolnick notified Plaintiffs that he will be *withdrawing* as their Counsel." Shevtsov Aff. Ex. 8 (emphasis added). At that time, Skolnick had told Barskiy that he would withdraw if plaintiffs insisted on backing out of the oral settlement agreement that they had reached with defendants at the January 23 conference. Shevtsov Aff. Ex. 6. Plaintiffs eventually relented, and Skolnick did not follow through on his threat. Shevtsov Aff. Ex. 8. In any event, Barskiy's comment that Skolnick "will be withdrawing" as plaintiffs' counsel is a tacit admission that Skolnick had been acting as plaintiffs' counsel. After all, Skonick could not *withdraw* as plaintiffs' counsel unless he had *served* as plaintiffs' counsel.

terms of the fee provisions of a retainer agreement." *Paulson*, 699 N.W.2d at 6. Unfortunately, though, no written retainer agreement exists, and although the parties agree that they reached an unwritten agreement about S&S's compensation, the parties sharply dispute the terms of that unwritten agreement.

Plaintiffs contend that they agreed to pay S&S a flat fee of $3,000 for any and all work done by Skolnick. Plaintiffs point out that the original emails sent to them by Saliterman say only that "[t]he amount requested by Mr. Skolnick is $3,000" and that "Mr. Skolnick has indicated that the $3,000 is a flat fee for his involvement in the mediation." Shevtsov Aff. Ex. 1. S&S responds that Saliterman's emails were sent at a time when everyone — the Court, plaintiffs, defendants, Saliterman, and Skolnick — expected that the settlement conference would last only one day. Thus, in S&S's view, Saliterman's reference to "the mediation" is merely a reference to Skolnick's attendance at the January 13 settlement conference.

S&S further claims that, at the conclusion of the January 13 conference, when it became apparent that Judge Graham's efforts to mediate a settlement would continue, Skolnick and plaintiffs agreed that any additional services performed by him after January 13 would be billed at $385 per hour, his ordinary billing rate. Plaintiffs strongly deny this. They contend that Skolnick never said that he would bill for his time after January 13 or that the $3,000 retainer covered only his attendance at the January 13 conference.

On September 5, 2012, the Court held an evidentiary hearing regarding this dispute. Both sides presented testimony and evidence supporting their contentions about the fee agreement between S&S and plaintiffs. All of the witnesses who testified appeared to be

credible, and thus it is difficult to resolve the dispute between the parties. On reflection, though, the Court finds that it is more likely than not that S&S's version is accurate.

There is no dispute that, at some point during the January 13 conference, it became clear that the case would not be settled in one day, and that the parties would have to continue their negotiations and appear again before Judge Graham. It is unrealistic to think that Skolnick would continue to work indefinitely on plaintiffs' behalf without an assurance of additional compensation. Moreover, it is unrealistic to think that plaintiffs would *expect* Skolnick to devote many more hours to their case without additional compensation. Saliterman had been billing plaintiffs on an hourly basis, and thus plaintiffs were familiar both with the concept of hourly billing and with the cost of a lawyer's time. It would not have been reasonable for plaintiffs to expect that, in return for $3,000, they were getting not just a full day of Skolnick's time at the January 13 conference, but an indefinite number of additional hours of his time after January 13. Thus, the Court finds, by a preponderance of the evidence, that S&S and plaintiffs agreed that Skolnick would be paid his standard hourly rate for the time that he devoted to the case after January 13.

The next most likely scenario, in the Court's view, is that S&S and plaintiffs simply did not reach a "meeting of the minds" regarding Skolnick's fees — with Skolnick (mistakenly) thinking that plaintiffs had agreed to pay his standard hourly rate for his time after January 13, and plaintiffs (mistakenly) thinking that Skolnick had agreed to work indefinitely on their case for $3,000. When an attorney and a client have not agreed on the attorney's compensation, "the amount of the lien is determined by the reasonable value of the services rendered." *Paulson*, 699 N.W.2d at 6. "The most useful starting point for determining the amount of a reasonable fee is

the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

The Court has reviewed the bills of S&S and finds that both the number of hours expended and the hourly rates charged are reasonable. S&S spent a total of 27.5 hours on plaintiffs' case, not including the time devoted to the January 13 settlement conference (which was covered by the $3,000 retainer). Skolnick Aff. Ex. 1. Nine of those hours — almost one-third of the time claimed — were devoted to the January 23 settlement conference. The remainder of time claimed by S&S consists mostly of reviewing documents (such as various drafts of the settlement papers) and communicating with Judge Graham, opposing counsel, and plaintiffs about the settlement negotiations. S&S devoted a total of 18.5 hours to these tasks over the course of more than two months, which is reasonable in light of the difficulty of the negotiations and the intransigence of plaintiffs. And based on Skolnick's credentials, the quality of his work, and the Court's substantial experience in ruling on requests for attorney's fees, the Court finds that Skolnick's hourly rate of $385 per hour is also reasonable.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of Skolnick & Shiff, P.A. to establish an attorney's lien against the funds paid by defendants to plaintiffs in settlement of this litigation [ECF No. 103] is GRANTED.

2. A lien in the amount of $10,419.50 is established in favor of Skolnick & Shiff, P.A. against the property of plaintiffs currently in the possession of Skolnick & Shiff, P.A.

3. Skolnick & Shiff, P.A. may enforce the lien immediately upon entry of this order and without further proceedings before this Court.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 19, 2012   s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge